TERRI KEYSER-COOPER
LAW OFFICE OF TERRI KEYSER-COOPER
California Bar No. 122355
3300 Skyline Blvd, No. 274
Reno, NV 89509
775-337-0323

DIANE K. VAILLANCOURT
LAW OFFICE OF DIANE K. VAILLANCOURT
California Bar No. 181348
849 Almar Ave., Suite C403
Santa Cruz, CA 95060
(831) 458-3440
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

EMORY BOYD, JR., QUINTON HANCOCK, and  NICHOLOS PAGE,

     Plaintiffs,

       vs.

FEATHER RIVER COMMUNITY COLLEGE DISTRICT, MERLE TRUEBLOOD, JOSH WHITE, and JAMES JOHNSON,

     Defendants.
_____/

**Case No. 2:11-CV-00231-JAM-EFB**

**FIRST AMENDED COMPLAINT FILED AS A MATTER OF RIGHT**

**Jury Demand**

## JURISDICTION AND VENUE

1.     In this case, the plaintiffs allege intentional racial discrimination in a community college athletic program. This Court has federal subject matter jurisdiction under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), 42 U.S.C. § 1981, 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  Jurisdiction is further conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1343.

2.     Venue in this action is appropriate in the Eastern District of California pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

3.     Plaintiff EMORY BOYD, JR. ("BOYD") is an African-American male and was at all times relevant a student at Feather River College and member of Feather River College's Golden Eagles Football team. BOYD currently resides in Darlington, South Carolina.

4.     Plaintiff QUINTON HANCOCK ("HANCOCK") is an African-American male and was at all times relevant a student at Feather River College and member of Feather River College's Golden Eagles Football team. Hancock currently resides in Quincy, California.

5.     Plaintiff NICHOLOS PAGE ("PAGE") is an African-American male and was at all times relevant a student at Feather River College and member of Feather River College's Golden Eagles Football team. PAGE currently resides in Kingstree, South Carolina.

6.     Defendant FEATHER RIVER COMMUNITY COLLEGE DISTRICT ("FRC") is a two-year community college located in Quincy, California, a small town in the mountains and forests of Plumas County. The population of Plumas County is primarily Caucasian, with an African-American population of approximately 0.6 percent.

7.     Defendant MERLE TRUEBLOOD ("TRUEBLOOD") is and was at all times relevant Athletic Director for FRC. He is sued in his individual capacity.

8.     Defendant JOSH WHITE ("WHITE") is and was at all times relevant a member of the coaching staff of FRC. He is sued in his individual capacity.

9.     Defendant JAMES JOHNSON ("JOHNSON") is and was at all times relevant a member of the coaching staff of FRC. He is sued in his individual capacity.


**FACTUAL ALLEGATIONS**

10.    Plaintiffs BOYD, HANCOCK, and PAGE belong to a protected class, African-American.

11.    FRC as an institution receives federal financial assistance for many of its programs

and activities.

12.     Plaintiffs each were recruited by FRC football coaches in or about years 2008 and 2009 to attend FRC and play football on FRC's Golden Eagle Football Team. FRC accepts all high school graduates who apply regardless of prior academic standing.

13.     Plaintiffs agreed to attend FRC, paid full out-of-state tuition, and did all that was required of them to participate in FRC's athletic program as a member of the Golden Eagles football team. In exchange for the paying of tuition and agreement to abide by the rules and regulations of FRC, plaintiffs expected to be treated in a manner free from racial discrimination.

14.     Plaintiffs received financial aid based on their attendance at FRC.

15.     Upon accepting plaintiffs' tuition payments, FRC entered a contractual relationship with each of plaintiffs subjecting it to certain duties and obligations.

16.     Each of plaintiffs traveled across the country to study at FRC with an understanding that if he worked hard, met academic standards and performed well on the field, FRC coaches would use their professional connections to help plaintiffs obtain athletic scholarships to four year colleges.

17.     Each of plaintiffs was aware that many (if not most) players before them who worked hard academically and on the football field received athletic scholarships to four year colleges. As part of their agreement to attend FRC, plaintiffs understood that upon successful completion of the FRC program, both academically and on the football field, they would receive the best efforts of the football coaching staff to place them at four year colleges with scholarships.

18.     While attending FRC as students, each of plaintiffs belonged to and played on FRC's Golden Eagles team for academic year 2009-2010 and was a committed member of the team, attending practices, improving skills and doing everything they were told to improve their performance on the field.

19.     Plaintiffs suffered racially discriminatory treatment wherein certain coaches, including but not limited to defendant JOHNSON and defendant WHITE, favored less committed and less skilled white players over their African-American counterparts, giving the white players

more play time and more opportunities on the field and treating them in a more favorable and less hostile manner. Play time on the field is crucial to student athletes because it gives them opportunity to be filmed. The film is viewed by potential colleges in considering scholarship offers. Without the film, athletes are less likely to receive scholarship opportunities

20.   In plaintiffs' presence, coach WHITE picked on, unfairly criticized, and made insulting personal remarks to African-American players that was heard by a wide variety of players in addition to plaintiffs.  Coach WHITE would harass various African-American players in the presence of the team, verbally abuse them, taunting and try to provoke them to fight physically with him. Coach WHITE's conduct created an intimidating, racially charged atmosphere for the African-American players on the team including plaintiffs. Coach WHITE did not treat the white players on the team with the same disrespect. He did not verbally abuse, taunt or attempt to provoke the white players to engage in physical fights with him.

21.   FRC officials TRUEBLOOD and JOHNSON were made aware of the racially hostile conduct of Coach WHITE because they observed him interact with the African-American players, on occasion had to intervene, and also received complaints about his treatment of the African-American players. Each had the ability to take corrective action to remedy Coach WHITE's mistreatment of the African-American players and each declined to do so. Their failure to do so interfered with plaintiffs' ability to utilize the educational programs and benefits of FRC as guaranteed to them pursuant to Title VI of the Civil Rights Act of 1964.

22. In addition, WHITE's conduct was observed by African-American Eric Small, assistant football coach, whose primary job for several years had been to recruit black student athletes from southern states.[1] WHITE made clear from the beginning of his employment that he was hostile to the black student athletes recruited by Small. WHITE's open, flagrant, intentional racial hostility was tolerated, condoned, and permitted to continue by defendants. WHITE demonstrated his racial hostility at the first scrimmage at FRC in which he participated by physically grabbing a black student player, pushing him, yelling and cursing at him without reason. The subsequent

---

[1] Eric Small has filed his own Complaint in this jurisdiction, *Eric Small v. Feather River College, et al*, 2:10-cv-3026 JAM GGH.

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

4

investigation concluded the player had done nothing to warrant WHITE's vitriolic attack. Despite this finding, to Small's and plaintiffs' knowledge, WHITE was not disciplined for his misconduct.

23. WHITE frequently yelled at the black student players, especially the ones recruited by Small, cursed at them, refused to play them, and humiliated them in front of the entire team. WHITE, unlike other coaches, did not engage in "constructive criticism" for these black student athletes. WHITE offered constructive criticism for the white players but treated the black players differently. He called them stupid, singled them out for criticism, and made his open disgust for their blackness obvious to all present – the players, other coaches, administrators, and Small. WHITE preferred to play inferior-playing white players and give them more time on the field, regularly sidelining black players with superior athletic ability in favor of poorer performing white players. Aware of WHITE's preferential treatment of the white players, the head coach did nothing to correct his conduct.

24. WHITE's hostility was clearly directed at the black student athletes. He did not pick on the white players and he treated the white players far better. WHITE made it known he did not like blacks. He intentionally ignored African-American coach Small and was openly insulting to him, denigrating him freely not only privately but also in front of plaintiffs and other team players.

25. WHITE also repeatedly provoked fights with the black student athletes that Small had recruited. He frequently balled up his fists and told the black student athletes: "You want to take this outside?" or "Do you want to fight me?"  or "I'll kick your ass" or "I'll bust your ass" or "Let's settle this right now outside" – making it clear to all he was ready, willing, and able to physically fight the black students he so openly despised. He tried to pick fights by insulting a particular black player, calling him stupid, provoking him to fight and then offering to take it "outside." He called the black players "pussy," "dickhead," "sons of bitches," "bitch," "no good son of a gun." Trained to not refer to the black players by openly racially derogatory terms such as the "N*" word, WHITE called them by other derogatory epithets as a proxy or code for racial derogation. WHITE reserved his use of these derogatory names for the black players. He did not

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

1  talk to the white student athletes in this derogatory manner.

2      26. WHITE's conduct occurred frequently, on a regular basis, amounting to a concerted,

3  repeated pattern of abuse. He frequently launched into a vitriolic attack on the black athletes. The

4  complained of conduct occurred as WHITE'S customary and usual conduct when interacting with

5  black students.

6      27. These comments were heard by a wide variety of students, more than ten have come

7  forward to sign declarations under penalty of perjury to the hateful racist verbally abusive conduct

8  of defendant WHITE that created a racially hostile environment on the team as a whole and

9  impacted plaintiffs' experience on the team.

10      28. As part of a repeated, routine pattern of conduct creating a racially hostile and

11  threatening atmosphere on the team, WHITE attempted to fight black students Brandell Gilbert,

12  Ronny Williams, Emile Sengor, Obie Donne, Bliel Leggett, Mike Alexander, Andrew Bowden

13  and Don Briggman—there were doubtless others.  In each of these cases, WHITE aggressively

14  and without provocation attempted to induce these African-American student athletes to get into

15  physical altercations with him so they could be kicked off the team. He provoked them and

16  taunted them—a sick, twisted conduct that was known to everyone within the football program

17  including JOHNSON, TRUEBLOOD, and former Head Coach Mooshagian. WHITE was never

18  observed talking in a similar manner to white players or attempting to induce them into physical

19  fights.

20      29. One time head coach Mooshagian admitted to Small that he knew WHITE had a

21  problem with "blacks" but shrugged it off as though it were nothing when Small complained that

22  WHITE's conduct constituted racial harassment towards the black players.

23      30. WHITE ridiculed the southern accents of the black student athletes. He imitated a

24  southern black accent and mocked them by using the word "y'all" in an insulting derogatory

25  manner.

26      31. WHITE threatened the black players and said (to the effect): "I'm going to kick you

27  off the team. You won't be invited back. You black players aren't what you're cracked up to be.

28

I'm going to get rid of you, and don't you forget my reputation around here." WHITE's outrageous racially charged conduct was shocking to Small and the black players he had recruited including plaintiffs. Never before had these students or Small seen an adult coach pick fights with his students. Small and the black players would rally around their provoked teammate, urging him to "calm down" and avoid WHITE's racist motivated exhortations to fight. Obviously, a student who engaged in a "fight" with a coach would face severe repercussions, and neither Small nor any of the black student athletes wanted that to occur. WHITE's conduct created a hostile, threatening atmosphere for the black student athletes including plaintiffs.

32. WHITE frequently refused to respond to the black student athletes if they asked him direct questions, he would turn his head and look the other way. When they spoke to him he did not speak back. By contrast, WHITE was courteous and appropriate when communicating with the white players.

33. Small talked to WHITE, to WHITE's superiors, and to his minority recruits without success in an effort to ameliorate the situation. He urged the black student athletes to stay at FRC and to give the program a chance despite WHITE's harassment and FRC's obvious disinclination to correct his racial misconduct.

34. On behalf of the African-American student athletes, including plaintiffs, Small complained about WHITE's racially charged misconduct to administrators and others in position to take corrective action. Not one member of the supervisorial staff took action to stop WHITE's misconduct. In a continuing pattern, FRC and its officials were made aware of WHITE's intentional discriminatory conduct towards black student athletes and responded with deliberate indifference to the strong likelihood that WHITE's conduct was violating their constitutional rights.

35. Coach Small's complaints about WHITE's mistreatment of the black student athletes occurred over a long period of time and were made to a variety of FRC supervisors.

- Small complained to Michael Bagley, FRC's dean of instruction, on multiple occasions, as recently as July 2010, about WHITE's mistreating the black players and Bagley did nothing to rectify the situation. Bagley told Small it was "noted" in WHITE's records that he tried to fight black

kids, as if "noting" it in his file and taking no other action was sufficient.

- Small complained to defendant TRUEBLOOD, FRC's athletic director, on multiple occasions about WHITE provoking physical fights with black students, the latest in April 2010. TRUEBLOOD alternately said he would "look into it," laughed about it, and did nothing.

- Small complained to former head coach Steve Mooshagian during the last football season and told him it was not fair that WHITE would refuse to play some of the team's best black athletes. Mooshagian's response was only to laugh and say, "Josh White can't coach black players." He took no action to correct WHITE's conduct towards the black athletes.

- Small complained to defendant coach JOHNSON (who replaced Coach Mooshagian) that WHITE was not playing certain black offensive lineman, preferring to play the white players. JOHNSON said he would "talk" to Mooshagian but nothing came of it.

- Small complained to Marie Enriquez, his TRIO boss at the time, telling her about a particular incident wherein WHITE attempted to fight a black student but, again, while FRC was made aware of WHITE'S misconduct, no remedial action was taken. In fact FRC officials with authority to hire gave WHITE the TRIO job, when Small moved over to the full-time associate head coach position, despite WHITE'S express hostility towards the black players, many of whom were forced to seek his assistance.

- Small complained to Lisa Kelly, interim dean of students, and sent a black student who had been threatened by WHITE to her office to speak to her. She did nothing to remedy WHITE's misconduct.

- Small complained to Jamie Cannon, human resource director, as recently as May 2010, who advised Small that "no report" of WHITE's misconduct had officially come across her desk, making it clear that despite Small's complaints, there was nothing she could (or would) do about WHITE wanting to fight black students for the absurd reason that she had not received an official "report."

36.    To plaintiffs' knowledge, Coach WHITE was never disciplined for his misconduct towards African-American team members, despite conduct that took place in the presence of his colleagues and superiors including JOHNSON and TRUEBLOOD. Despite the fact that FRC officials authorized to correct such conduct had notice of WHITE's discriminatory treatment of the African-American players, no remedies were taken and WHITE's conduct continued unabated.

37.    FRC, TRUEBLOOD and JOHNSON had a contractual obligation to provide equal

1    treatment in educational programs and benefits to plaintiffs without racial discrimination and

2    without regard to race in any manner. In permitting, condoning and approving overt racial

3    discrimination and hostility towards black players in the football program, these defendants violated

4    this duty.

5          38.    Each of plaintiffs was eligible both academically and athletically to return to play

6    football for FRC in the 2010-2011 season.

7          39.    Each of plaintiffs left FRC for summer break in or about May 2010 with the

8    expectation that he would return to FRC that fall to play football with the Golden Eagles team,

9    complete his Associate of Arts degree, and obtain assistance and the best efforts of FRC's coaching

10   staff to move on to four-year colleges with or without an athletic scholarship.

11         40.    Each of plaintiffs reasonably expected fair notice of his continued ability to play

12   football on the Golden Eagles team with sufficient time to enable them to make plans to attend other

13   schools if necessary.

14         41.    Each of plaintiffs expected to be treated fairly without racial discrimination in the

15   determination of who would be allowed to continue playing football in the 2010-2011 season. Each

16   of plaintiffs met all academic and athletic eligibility requirements of which they were aware for

17   continuing to play football in the 2010-2011 season.

18         42.    Each of plaintiffs was cut from the football team roster in late July or early August

19   2010 when the 2010-2011 academic year was about to start. Each of the plaintiffs was cut at the

20   very last minute so as to make it impossible for him to arrange alternative educational opportunities.

21   None of plaintiffs was provided an explanation or rationale about why they were cut.

22         43.    Each of plaintiffs was a victim of a calculated, intentional effort by defendants to

23   reduce the number of African-Americans playing football for FRC and increase the number of

24   white players—to "change the face" of the football team—the stated desire of defendant athletic

25   director TRUEBLOOD with the knowledge and consent of JOHNSON.

26         44.    Between academic years 2009-2010 and 2010-2011, defendants changed FRC's

27   football team from predominantly black to predominantly white by disproportionately cutting

28

eligible returning African-American players including plaintiffs from the team and disproportionately recruiting white players to play football for FRC in their place. In so doing, defendants considered race in the selection of who would be allowed to play on their football team in the 2010-2011 academic year.

45.   On or about July 8-12, 2010, TRUEBLOOD announced he would "change the face" of FRC's football team. TRUEBLOOD wanted fewer African-Americans on the team and more whites. JOHNSON, the newly installed head coach, was in agreement and implemented the cuts. Both agreed that the African-American players, especially players recruited by former head football coach Eric Small from the southeastern states, were undesirable, unwanted, and unwelcome on their team.  Both TRUEBLOOD and JOHNSON were adamant that they would reinvent the team by culling the majority of African-American players.

46.   TRUEBLOOD and JOHNSON began immediately to implement this change in policy, ridding the team of its black athletes and replacing them with white athletes. This change in policy was, and at all times constituted, an intentional purposeful effort to racially discriminate against plaintiffs and others similarly situated in violation of Title VI, 42 U.S.C. § 1981, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

47.   In 2009, approximately 72 black and 27 white players were on a roster of 99 players. The team was approximately 73% black. By 2010, in the first months of defendant JOHNSON's appointment to the head coach position, about 31 black and 47 white players were listed on a diminished roster of 78 players. JOHNSON thus transformed the team from over 70% black to 60% white from the 2009 to 2010 season, with diminished prospects for plaintiffs and other minority black players. This effort was made with knowledge and approval of TRUEBLOOD.

48.   To transform the team from mostly black to mostly white, JOHNSON cut 18 returning black players from the 2009 team, three of whom are bringing this lawsuit. The total number of players who were cut was 21 players, 18 of whom were African-American and only 3 were white. Thus, approximately 86% of the 21 returning players who were cut were African-Americans like plaintiffs. In addition, approximately 7 African-American players eligible to return

1   opted not to do so, seeing what they perceived as a racially hostile atmosphere towards black

2   athletes.

3         49.      Additionally, in recruiting new players, JOHNSON invited mostly white players and

4   rejected several black players already recruited by former coach Small. Of the approximately 43

5   new recruits to the 2010 team, 36 were white and only 7 were black. ***Whereas before, 80% of new***

6   ***recruits were black, in 2010 – in a complete reversal under JOHNSON – 80% of the new recruits***

7   ***were white and only 20% were black***.[2] The recruits made by Eric Small, which in prior years

8   constituted almost the entire team, were summarily rejected by JOHNSON with the knowledge,

9   consent, and approval of TRUEBLOOD. Most of the black recruits Small had spent months

10  cultivating were abruptly rejected from the team without explanation; this was an unprecedented

11  rejection on the basis of race.

12        50.      By the 2010 season, in keeping with the intentional effort to change the face of the

13  football team from black to white, the racial composition of the team changed dramatically.

14        51.      It was unprecedented for FRC to cut eligible returning players from the football

15  roster. In prior years, the policy was to accept all returning players academically eligible to play.

16  The team roster was limited and plaintiffs were cut as part of an intentional racially discriminatory

17  effort by FRC defendants to reduce the number of African-American football players on its team

18  while increasing the number of white players.

19        52.      Each of plaintiffs was cut from the team in such a way as to interfere with his ability

20  to play football on a college team during the 2010-2011 season, thus harming his prospects for

21  obtaining a football scholarship to a four-year school.

22        53.      FRC officials TRUEBLOOD and JOHNSON deprived plaintiffs of the full benefit of

23  FRC's educational programs and activities by using race as a factor in cutting African-American

24  team members from the roster while increasing the number of white players on the roster.

25        54.      FRC, TRUEBLOOD and JOHNSON violated their contractual obligation to provide

26  equal opportunities and benefits to plaintiffs by intentionally using race as a factor in cutting

27

28  _____

[2] All figures are approximate and are based on the best information available to plaintiffs at
this time.

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT                                11

1   returning African-American team members from the roster while increasing the number of white

2   players on the roster.

3       55.     FRC, TRUEBLOOD and JOHNSON used race as a factor in creating two classes of

4   potential team members. Those team members rejected from the roster were predominantly African-

5   American, whereas those team members invited to participate in the 2010-2011 football team were

6   predominately white.

7       56.     As a result of the above described conduct, each plaintiff was irreparably harmed,

8   both emotionally and financially, by defendants' deliberate and intentional discriminatory conduct.

9   **EMORY BOYD, JR.**

10      57.     Plaintiff EMORY BOYD, JR. came to FRC in 2009 from South Carolina. BOYD

11  first arrived in Quincy, California on or about August 3, 2009. Several of his cousins had gone to

12  FRC to play football and had done well—he was anxious to do the same. His high school football

13  coach had talked to him about FRC and he had followed up with Coach Eric Small. BOYD's goal

14  was to obtain his Associate of Arts degree and play for FRC's football team.

15      58.     Based on what he had heard from others who had attended FRC, BOYD reasonably

16  believed if he performed well academically and athletically, he would graduate with an Associate of

17  Arts degree and FRC would utilize its best efforts to place him in a four-year college with a football

18  scholarship. He understood it was the policy of FRC to do everything it could to further the

19  educational career of its football players upon completion of their FRC career.

20      59.     When BOYD arrived at FRC, he practiced with the team. He was a defensive

21  linebacker, with JOHNSON his coach. The understanding was that, BOYD would practice and

22  work out with the team during the 2010 spring training and he would play for FRC's team during

23  the fall 2010 season.

24      60.     While practicing with the team and attending trainings, BOYD observed Coach

25  WHITE and how he interacted with the players. It was obvious to BOYD that WHITE effectively

26  created two classes of players: white versus black and the black players were treated different from

27  and worse than the white players. WHITE would play inferior white players over better performing

28

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

1   black players. It struck BOYD as exceedingly unfair and made him uncomfortable, severely

2   distressed, and emotionally disturbed.

3        61.    BOYD attended spring practice with the team in April 2010. He improved

4   dramatically. He followed all instructions, working out a minimum of four hours each day on the

5   specific performance criteria mandated by Coach JOHNSON. In each and every area, including

6   speed, coverage, and strength, BOYD made huge improvements. He expected he would continue to

7   be on the team in fall 2010 and an active player.

8        62.    In or about summer 2010, while at home with his family in South Carolina, BOYD

9   made over ten telephone calls to Coach JOHNSON to confirm his status on the team roster for the

10   coming year. He did not receive a response. He was not concerned about playing in the fall because

11   he had worked hard in spring practice, performed well on the field, and his coaches led him to

12   believe he would be on the football roster in fall 2010. It was his understanding that all eligible

13   football players were consistently invited back and nobody was ever cut unless ineligible to

14   continue.

15        63.    In late July 2010, JOHNSON sent BOYD a text message saying "looking forward to

16   seeing you in August." From that message, BOYD reasonably believed he was on the team and

17   made plans to return to FRC in August.

18        64.    BOYD traveled from South Carolina to attend FRC's football camp in August 2010

19   on the assumption he was still on the team. At the conclusion of the camp he was still not sure if he

20   was formally on the team. At camp, he was given very little opportunity to perform. He attended all

21   practices and attended the required classes relating to football, requirements for all players on the

22   team—he thought he was on the team and the courses were mandated for all members of the team.

23        65.    BOYD went to JOHNSON and write two or three times to ask and to make sure he

24   was on the team. They assured him he was. BOYD went to football classes, a requirement for all

25   team members and participated in team practices After a while, he discovered, through no fault of

26   his own, he was not on the roster for the football classes and he was not enrolled in the football

27   program as is necessary for all members of the team.

28

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

66.     BOYD sought and received "add slips" signed by both JOHNSON and WHITE to be given to Dr. Bagley to assure his formal placement in the football classes and on the team—without being formally placed on the team by the "add slips" he would not receive credit for participation in the football program. He hand-carried the slips signed by the coaches to Dr. Bagley's box and placed them directly in the box. He received no response from Dr. Bagley—this FRC official did not contact him to confirm or deny his placement on the team or to explain his circumstances. However, with the aid of a teacher, he was able to confirm that he was not added to the football classes contrary to what he was led to believe.

67.     BOYD again approached Coach WHITE, about whether he was in fact on the team. He was totally confused, he had confirmed what the teacher had told him by looking on the internet and realized he was not receiving any credit for attending football classes and practices, which meant he was not officially on the team. WHITE put him off, saying, "I'm going to get to it." WHITE assured BOYD he was on top of the matter and told him not to "worry" – he would make sure BOYD was formally enrolled in the program.

68.     BOYD continued to attend all football classes and practices in good faith, still thinking he was on the team and that the matter of his enrollment was a minor matter that would soon be cleared up. In or about October 2010, he finally realized head coach JOHNSON had no intention of keeping him on the team, he was cut from the program without being told he was cut, and his attendance at the classes and practices was meaningless – a charade.  From this realization, he understood JOHNSON, with WHITE's assistance, had toyed with him, exploited him, and never had any intention of keeping him on the team.

69.     BOYD realized he had been fooled into returning to FRC to pay tuition and attend classes on the premise he would continue to be on the football team when there was never an intention to keep him on the team. Inferior white players who were not performing well were still on the team, whereas, he, an African-American, was not being given a fair shake. He realized that JOHNSON and WHITE had been lying to him. Before he left FRC, he approached WHITE again, explaining that he had not formally been put on the team or in football classes, WHITE did not

respond, but blew him off. BOYD was shocked and devastated.

70.     BOYD did not have another school to go to or any way to continue his football efforts to gain a possible scholarship. It was too late for him to find an alternative school, the academic year was in full progress. He was extremely depressed, upset, and confused. He suffered a nervous breakdown which resulted in an ambulance picking him up and taking him to a hospital. He was extremely anxious, upset and distressed and experienced physical symptoms consistent with severe depression. Unable to continue, he left FRC and returned home to South Carolina.

## QUINTON HANCOCK

71. Plaintiff HANCOCK, 24, encouraged by his brother, met with coach Small and agreed to travel from South Carolina to Quincy, California to play football. His goal was to perform well academically and on the football field and earn a football scholarship to a four year college. He knew his chances were good Small could deliver on helping him connect with those who could offer scholarship possibilities. He had seen it happen with others.

72. HANCOCK came to FRC from South Carolina in January 2010. He graduated from high school in 2005 and worked for several years as a machinist before deciding to further his education.

73.  At the time HANCOCK arrived, FRC's head coach was Mooshagian. HANCOCK put his mind and body to work, practicing every day working as an outside line backer on the defense as well as training, and conditioning as demanded.   He performed well in spring training and reasonably believed he was one of the team's top linebackers. HANCOCK liked the FRC's coaching staff and was excited to be part of the team. He believed that both Coach Mooshagian and Coach Small were dedicated to helping student athletes succeed and reasonably believed the coaching staff at FRC would utilize their best efforts to obtain him a scholarship to a four-year college at the conclusion of his FRC program.

74. HANCOCK worked hard to get good grades and went to all practices. He was a vital member of FRC's football team and was progressing towards his athletic and academic goals. While he was playing football for FRC, HANCOCK had a GPA of nearly 3.0.

75. Coach Mooshagian and Coach Small both complimented HANCOCK's performance

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

and dedication. Mooshagian told him he liked the way he played and commented on how quick and sure his performance was. Mooshagian told him he had a good work ethic, and Coach Small told him he looked good on the field and seemed happy with his performance.

76. While practicing with the team, HANCOCK witnessed WHITE picking fights with various black members of the team and talking disrespectfully to them—in a manner far different and worst than anything he had ever seen or heard before. WHITE would frequently curse at the black players, especially those from southern states recruited by Coach Small. HANCOCK was uncomfortable witnessing WHITE's hostility towards his African-American team members. WHITE's racist conduct created an oppressive atmosphere for the team's African-American players including HANCOCK.

77. HANCOCK also observed JOHNSON express direct hostility to the black players. Like WHITE, JOHNSON avoided talking with the black players regarding team matters while freely talking with the white players. JOHNSON and WHITE treated the white players differently. HANCOCK had never seen coaches before who would not talk to certain team members and being excluded in this way made him very uncomfortable.

78. HANCOCK returned to his home in South Carolina for the summer of 2010 confident of his future with FRC. He had no doubt he would return to FRC in the fall and continue to play for the team.

79. While in South Carolina, HANCOCK called Mooshagian twice a week for most of the summer to make sure of his status. Though he was confident he was on the team, especially since Mooshagian had gone out of his way to compliment him, Mooshagian never answered his calls or returned his messages which caused him some concern. HANCOCK also called JOHNSON who also didn't answer his calls or return his messages. His brother, Ray Davis, also called JOHNSON on his behalf and JOHNSON would not pick up Davis's calls or return his messages either.

80. HANCOCK, still believing he would be on the team, returned to Quincy, California from South Carolina in August, 2010. He was shocked and upset to learn he had been cut. At no time was he notified before returning to Quincy that he would be cut from the team—no calls were

made to him and no letters received. He was devastated, angry, emotionally distressed and depressed; he could not believe this could happen. He had given FRC his all to keep his grades and stay on the team, he knew his performance was excellent and his grades were good—he had received only praise for the work he had done.

81. HANCOCK chose to remain at FRC to complete the program and finish with a two year degree. Had HANCOCK known he was going to be cut from the team he would not have returned from South Carolina, but would have remained there to complete his education. By the time he learned he had been cut from the team, he had already flown across country, arranged for financial aid, housing, and the other necessities. It was financially extremely difficult for him to return to South Carolina at that point—he was stuck in Quincy and unable to play football.

**NICHOLOS PAGE**

82. Plaintiff NICHOLOS PAGE came to FRC as a college freshman in fall 2008 to obtain his Associate of Arts degree and play for FRC's football team. A graduate of high school in South Carolina, FRC offered him an opportunity to play collegiate football and, if he worked hard, to obtain an athletic scholarship to a four-year college.

83. PAGE was recruited to FRC by Coach Eric Small. He understood from Coach Small and from other players that if he did well academically and on the football team FRC would do everything possible to place him in a four year college on a scholarship. He understood it was the policy of FRC to do everything it could to further the educational career of its football players upon completion of their FRC career.

84. PAGE took the required number of academic credits to maintain team eligibility and progress towards his AA degree. His GPA was well above the 2.0 requirement for continuing football eligibility.

85. PAGE played on the FRC football team for the 2009 season under Coach Mooshagian as an offensive guard. He was a solid player and improved consistently with practice. He went to all required meetings and fulfilled all requirements.

86. At the end of the spring 2010 semester, PAGE was told by Coach Mooshagian that

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

all players would be informed by mail if they were invited back to play for the upcoming 2010-2011 season. Mooshagian told him immediately following the 2009 football season that he would be "more than happy to have him back because he was a veteran player."

87.    When Coach JOHNSON took over from Coach Mooshagian in July 2010, he told the players he would notify them as to whether they would be invited back. It was at all times understood, from Coach Small and other players, that all returning players would be invited to play as long as they were academically qualified. He understood that nobody was ever cut unless ineligible to continue.

88.    PAGE knew he was academically qualified, thus he was not concerned about a "formal invitation" back to play for the 2010 football season. He knew he had fulfilled all his football requirements and had done well in his classes and on the field. In fact, since he was so sure he would be invited to return, his family in South Carolina made plans to fly to FRC to attend the October 2010 Homecoming festivities.

89.    As of late July 2010, PAGE had still not received any communication from FRC or Coach JOHNSON. It was time for him to make his plane reservation to return to Quincy for school. On or about July 28, 2010, he emailed Coach JOHNSON about the fall semester—he asked him what was going on, whether or not he was invited back to play football. He needed to have this information before he made final plane reservations and arranged for final housing and financial aid for the upcoming school year.

90.    Coach JOHNSON emailed him back that he was no longer needed and the football roster was filled. PAGE was extremely upset. It was too late for him to arrange college and he had no way to continue his football efforts to gain a possible scholarship. He was anxious, upset, emotionally distressed and experienced physical symptoms consistent with depression.

91.    During his time at FRC, PAGE was repeatedly exposed to Coach Joshua WHITE and his obvious racial bias against black football players. Coach WHITE subjected PAGE and other black players to more difficult treatment, distinct from and worse than the treatment he gave white players. He made it extremely clear he preferred white players to black players and showed a

18

special dislike and disgust for the black players, like PAGE, from the southern states. WHITE would play the white players over the black players whenever possible. Even if the white players were inferior to the black players, he would give them play time and use them consistently over black players in each and every game.

92.     PAGE personally witnessed Coach WHITE attempting to provoke black players to fight with him in physical altercations. PAGE had never before witnessed conduct like that; he had never seen a coach attempt to fight a student athlete. It was well known if a student player hit a coach he would be immediately removed from the team. It was obvious to PAGE WHITE was goading the black players to strike him, or attempt to strike him, as grounds to have the student thrown off the team. He heard WHITE call players "pussy," "dickhead," "bitches," "sons of bitches," "no good son of a gun" and other insulting names. WHITE did not talk that way to white players. WHITE's conduct, in the presence of other coaches, struck him at the time as exceedingly unfair and made him uncomfortable, severely distressed, and emotionally disturbed.

93.     PAGE tried to talk to WHITE regarding team issues but WHITE refused to talk with him. WHITE would talk to the white players but not to PAGE or other black players. It was obvious to PAGE that WHITE had effectively created two classes of players: white and black and the black players were treated different from and worse than the white players.

94.     WHITE refused to allow PAGE to play in games even though PAGE reasonably believes he was one of the better players. Regardless of PAGE'S efforts, abilities, or persistence, WHITE would not play him in games.[3] PAGE practiced with the team and was able to compare his abilities to the abilities of other players—from this, he was easily able to discern that the players WHITE put into games were inferior to him. It is believed and alleged that JOHNSON and other FRC officials were aware of WHITE's intentional discrimination against PAGE and the other African-American players and looked the other way rather than remedy the conduct.

95.     The importance of playing in games cannot be overstated. PAGE needed to play so he could obtain "film" which would be used to send to schools and solicit potential scholarship

---

[3] PAGE would be dressed out for every game and would sit on the bench. On one occasion he was put on the field in the last minutes of the fourth quarter, but there was no way for him to play. The clock was just running.

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

19

offers. Without playing in games he could not obtain the necessary highlights film. PAGE did not

return to FRC and remains in South Carolina taking online classes from FRC to complete his AA.

degree. Without film from the 2010 season, he has no hope of gaining a football scholarship. For

PAGE, the whole experience was a waste of time and money because he never got enough film to

send off to four-year schools and his dream of a football scholarship was taken away from him.


### FIRST CAUSE OF ACTION

**Violation of Title VI-Racially Hostile Educational Environment**
**Defendant FRC**

96.     Plaintiffs BOYD, HANCOCK, and PAGE reallege and incorporate by reference

herein the allegations above contained.

97.     Title VI was originally passed as part of the 1964 Civil Rights Act. It contains a

prohibition on the use of federal dollars to subsidize racial discrimination.

98.     FRC is an educational institution that receives federal financial assistance for many

of its programs and activities. As FRC students during the relevant time period, plaintiffs are the

intended beneficiaries of FRC's federal dollars.

99.     An educational institution violates Title VI when (1) there is a racially hostile

environment; (2) the institution had notice of the problem; and (3) it failed to respond adequately to

redress the racially hostile environment, which amounts to deliberate indifference.

100.     Plaintiffs and each of them were subjected to an educational environment that was

permeated with racial hostility, antagonism, maltreatment and humiliation, towards themselves as

black athletes. This intentionally racially hostile conduct was purposeful, severe, pervasive and

persistent so as to interfere with or limit the ability of plaintiffs to participate in or benefit from the

services, activities or privileges provided by FRC to its students.

101.     Officials with authority to address the discriminatory conduct and to institute

corrective measures, including but not limited to TRUEBLOOD and JOHNSON, had actual

knowledge of a racially hostile environment for the African-American players and at times

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

participated in such conduct. These officials witnessed WHITE engage in conduct that was hostile and discriminatory towards the African-American players, and FRC officials failed to respond adequately to redress the racially hostile environment, which amounts to deliberate indifference.

102.   FRC was deliberately indifferent to plaintiffs' rights as secured under Title VI by virtue of its condoning, tolerance, approval of and consent to intentional racial discrimination in its football program. In addition, it intended to harm plaintiffs and other black athletes and interfere with their ability to complete their educational programs and to participate fully with the same rights and privileges as accorded FRC's white athletes.

103.   Defendant FRC is liable for the acts of supervisors TRUEBLOOD and JOHNSON because an educational institution may be found liable when its officials who have power to correct a racially hostile educational environment are aware of the conduct and fail to remedy such conduct. FRC delegated to both TRUEBLOOD and JOHNSON the ability to correct the racially hostile educational environment that was created in large part by WHITE. Both had notice of its existence and did nothing to correct the situation—they in fact were instigators of intentional racial discrimination and both desired to change the face of the football team and to remove qualified black athletes because of the color of their skin.

104.   As a direct and proximate result of the aforedescribed unlawful and malicious conduct by defendant plaintiffs suffered economic loss, grievous bodily harm and emotional distress in violation of 42 U.S.C.A. Section 2000d known as Title VI of the 1964 Civil Rights Act. Plaintiffs suffered the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, injury to their educational prospects, and loss of enjoyment of the ordinary pleasures of everyday life causing plaintiffs to seek compensatory and economic damages from FRC.

**SECOND CAUSE OF ACTION**

**Violation of Title VI-Racial Discrimination in Education**
**Defendant FRC**

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

105.    Plaintiffs BOYD, HANCOCK, and PAGE reallege and incorporate by reference herein the allegations above contained.

106.    Title VI was originally passed as part of the 1964 Civil Rights Act. It contains a prohibition on the use of federal dollars to subsidize racial discrimination.

107.    FRC as an institution receives federal financial assistance for many of its programs and activities. As FRC students during the relevant time period, plaintiffs are the intended beneficiaries of FRC's federal dollars.

108.    Each of plaintiffs received financial aid based on their attendance at FRC.

109.    Plaintiffs met academic and athletic standards for continuing to play on FRC's team in academic year 2010-2011.

110.    FRC through TRUEBLOOD and JOHNSON reduced the football team roster and eliminated plaintiffs from the team in its deliberate effort to reduce the proportion of African-American players and increase the proportion of white players, thereby "changing the face of the team" from predominantly black to predominantly white.

111.    While cutting plaintiffs from its football team and eliminating them from the team roster, FRC simultaneously invited predominantly white players from the prior year to return and recruited new players who were predominantly white to join the team.

112.    This racial discrimination was an institutional effort purposefully designed to cull African-American players from the team and to preclude plaintiffs from participating in or benefiting from the services, activities or privileges provided by FRC to its students.

113.    FRC was at all times deliberately indifferent to plaintiffs' rights as secured under Title VI by virtue of its condoning, tolerance, approval of and consent to intentional racial discrimination eliminating African-American players from its football program while increasing the white players. FRC also intended to harm plaintiffs and other black athletes and interfere with their ability to complete their educational programs and to participate fully with the same rights and privileges as white athletes.

114.    Defendant FRC is liable for the acts of supervisors TRUEBLOOD and JOHNSON

who acted on its behalf to change the face of the football team and remove qualified black athletes from the team because of the color of their skin.

115.    As a direct and proximate result of the aforedescribed unlawful and malicious conduct by defendant FRC, plaintiffs suffered economic loss, grievous bodily harm and emotional distress in violation of 42 U.S.C. Section 2000d known as Title VI of the 1964 Civil Rights Act. Plaintiffs suffered the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, injury to their educational prospects, and loss of enjoyment of the ordinary pleasures of everyday life causing plaintiffs to seek compensatory and economic damages from FRC.

## THIRD CAUSE OF ACTION

### Intentional Discrimination in the Making of a Contract—42 U.S.C. § 1981
### Defendants TRUEBLOOD and JOHNSON

116.    Plaintiffs BOYD, HANCOCK, and PAGE reallege and incorporate by reference herein the allegations above contained.

117.    Plaintiffs belong to a protected class. They paid tuition to FRC for educational services and in return FRC entered into a contractual relationship with each plaintiff. FRC received payments for educational services rendered and plaintiffs received instruction and access to FRC programs and activities. In rendering those educational services FRC agreed not to discriminate on the basis of race and to treat plaintiffs fairly, in a racially neutral manner, and to provide educational programs and benefits equal to and identical with those provided to white students.

118.    Defendants and each of them purposefully adopted a policy and a conduct designed to intentionally discriminate on the basis of race by treating the black group of football players different from and worse than the non-black group and by reducing the number of black athletes in the football program while increasing the participation of whites.

119.    The protection of student athletes from racial discrimination in the making and enforcement of contracts is a clearly mandated public policy.

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

23

120.   As a direct and proximate result of the aforedescribed unlawful and malicious conduct by defendants, plaintiffs suffered economic loss, grievous bodily harm and emotional distress in violation of 42 U.S.C. § 1981. Plaintiffs suffered the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, injury to their educational prospects, and loss of enjoyment of the ordinary pleasures of everyday life.

121.   As a direct and proximate result of defendant's actions and disregard for plaintiffs' rights to be free from racially discriminatory and hostile conduct based on race,  plaintiffs have suffered damages including lost benefits, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, and loss of enjoyment of the ordinary pleasures of everyday life causing plaintiffs to seek compensatory and economic damages from all defendants.

122.   The conduct of defendants TRUEBLOOD and JOHNSON was malicious, oppressive, and made with reckless disregard for the plaintiffs' rights to be free from intentional racial discrimination. As a result, plaintiffs have suffered damages including lost benefits, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, and loss of enjoyment of the ordinary pleasures of everyday life. For these reasons, plaintiffs also seek in addition to compensatory damages but also punitive damages against defendants TRUEBLOOD and JOHNSON.

#### FOURTH CAUSE OF ACTION

**Violation of Equal Protection Clause of Fourteenth Amendment—42 U.S.C. § 1983
Defendants TRUEBLOOD and JOHNSON**

123.   Plaintiffs BOYD, HANCOCK, and PAGE reallege and incorporate by reference

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

herein the allegations above contained.

124.   Defendants, acting under color of law, deprived plaintiffs of rights secured by the Constitution and by the laws of the United States by intentionally and purposefully violating plaintiffs' right to equal educational opportunities on the basis of race. By intentionally creating two classes of student athletes, black and non-black, and treating the black group different from and worse than the non-black group, defendants violated the Equal Protection Clause of the Fourteenth Amendment.

125.   As a direct and proximate result of the aforedescribed unlawful and malicious conduct by defendant plaintiffs suffered economic loss, grievous bodily harm and emotional distress in violation of 42 U.S.C. § 1983. Plaintiffs suffered the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, injury to their educational prospects, and loss of enjoyment of the ordinary pleasures of everyday life causing plaintiffs to seek compensatory and economic damages from all defendants.

126.   The conduct of defendants TRUEBLOOD and JOHNSON was malicious, oppressive, and made with reckless disregard for the plaintiffs' rights to be free from intentional racial discrimination. As a result, plaintiffs have suffered damages including lost benefits, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, and loss of enjoyment of the ordinary pleasures of everyday life. For these reasons, plaintiffs also seek in addition to compensatory damages but also punitive damages against defendants TRUEBLOOD and JOHNSON.

## FIFTH CAUSE OF ACTION

**Intentional Discrimination in the Making of a Contract—42 U.S.C. § 1981**
**Plaintiffs BOYD, HANCOCK and PAGE v. Defendant WHITE**

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

127.      Plaintiffs BOYD, HANCOCK, and PAGE reallege and incorporate by reference herein the allegations above contained.

128.      Plaintiffs belong to a protected class. They paid tuition to FRC for educational services and in return FRC and, by extension, WHITE entered into a contractual relationship with each plaintiff. FRC received payments for educational services rendered and plaintiffs received instruction and access to FRC programs and activities. In rendering those educational services FRC agreed not to discriminate on the basis of race and to treat plaintiffs fairly, in a racially neutral manner, and to provide educational programs and benefits equal to and identical with those provided to white students.

129.      WHITE purposefully discriminated against plaintiffs on the basis of race by treating the black group of football players different from and worse than the non-black group and by creating a racially hostile educational environment for his African-American student athletes.

130.      The protection of student athletes from racial discrimination in the making and enforcement of contracts is a clearly mandated public policy.

131.      As a direct and proximate result of the aforedescribed unlawful and malicious conduct by defendants, plaintiffs suffered economic loss, grievous bodily harm and emotional distress in violation of 42 U.S.C. § 1981. Plaintiffs suffered the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, injury to their educational prospects, and loss of enjoyment of the ordinary pleasures of everyday life.

132.      As a direct and proximate result of defendant's actions and disregard for plaintiffs' rights to be free from racially discriminatory and hostile conduct based on race,  plaintiffs have suffered damages including lost benefits, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, and loss of enjoyment of the ordinary pleasures of everyday life causing plaintiffs to seek

*Boyd et al.  v. Feather River College et al.* – FIRST AMENDED COMPLAINT

compensatory and economic damages from WHITE.

133.    The conduct of defendant WHITE was malicious, oppressive, and made with reckless disregard for the plaintiffs' rights to be free from intentional racial discrimination. As a result, plaintiffs have suffered damages including lost benefits, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, and loss of enjoyment of the ordinary pleasures of everyday life. For these reasons, plaintiffs also seek in addition to compensatory damages but also punitive damages against defendant WHITE.

## SIXTH CAUSE OF ACTION

**Violation of Equal Protection Clause of Fourteenth Amendment-42 U.S.C. § 1983**
**Plaintiffs BOYD, HANCOCK and PAGE v. Defendant WHITE**

134.    Plaintiffs BOYD, HANCOCK, and PAGE reallege and incorporate by reference herein the allegations above contained.

135.    Defendants, acting under color of law, deprived plaintiffs of rights secured by the Constitution and by the laws of the United States by intentionally and purposefully violating plaintiffs' right to equal educational opportunities on the basis of race. By intentionally creating two classes of student athletes, black and non-black, and treating the black group different from and worse than the non-black group, WHITE violated the Equal Protection Clause of the Fourteenth Amendment.

136.    As a direct and proximate result of the aforedescribed unlawful and malicious conduct by defendant plaintiffs suffered economic loss, grievous bodily harm and emotional distress in violation of 42 U.S.C. Section 1983. Plaintiffs suffered the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their reputation, disruption of their personal life, injury to their educational prospects, and loss of enjoyment of the ordinary pleasures of everyday life causing plaintiffs to seek compensatory and economic damages

1  from all defendants.

2       137.   The conduct of defendant WHITE was malicious, oppressive, and made with

3  reckless disregard for the plaintiffs' rights to be free from intentional racial discrimination. As a

4  result, plaintiffs have suffered damages including lost benefits, the indignity of discrimination, the

5  invasion of the right to be free from discrimination, and great humiliation which is and was manifest

6  in emotional distress, outrage, severe anxiety about their future, damage to their reputation,

7  disruption of their personal life, and loss of enjoyment of the ordinary pleasures of everyday life.

8  For these reasons, plaintiffs also seek in addition to compensatory damages but also punitive

9  damages against defendant WHITE.

10

11                          **RELIEF REQUESTED**

12
        WHEREFORE, plaintiffs pray for judgment against defendants as follows:

13
        (a)        For declaratory relief;

14
        (b)        For compensatory damages from defendants in an amount to be determined at

15  trial;

16
        (c)        For economic damages including past, present and future economic damages;

17
        (d)        For punitive damages as against the individual defendants;

18
        (e)        For attorneys' fees and costs incurred herein;

19
        (f)        For leave to amend this complaint should the same become necessary;

20
        (g)        For such other and further relief as this Court may deem appropriate.

21

22
        Dated:  The 14th Day of April, 2011.

23

24
                                              /s/ Terri Keyser-Cooper

25                                            TERRI KEYSER-COOPER
                                              DIANE K. VAILLANCOURT
26                                            *Attorneys for Plaintiffs Boyd, Hancock,*
                                              *and Page*
27

28

**CERTIFICATE OF SERVICE**

I, Diane K. Vaillancourt, declare as follows:

  I am over the age of 18 years and not a party to this action. My business address is 849 Almar Avenue, Suite C403, Santa Cruz, CA 95060.

  On this date, I served a copy of the following documents on the parties in this action as follows:

PLAINTIFF'S FIRST AMENDED COMPLAINT

[ ] BY UNITED STATES MAIL.  By placing a true copy of the above-referenced document(s) in the United States Mail in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ] BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission from facsimile number (831) 458-3440 to the interested parties in this action at the facsimile number(s) shown below.

[ ] BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[ X ] BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure: Jennifer Lynn Hippo jennifer@jsl-law.com, melissa@jsl-law.com, susan@jsl-law.com

  Alesa Schachter
  Jennifer L. Hippo
  JOHNSON, SCHACTER & LEWIS
  2180 Harvard Street, Suite 560
  Sacramento, CA 95815
  Tele: (916) 921-5800
  Fax:  (916) 921-0247

  I declare under penalty of perjury that the foregoing is true and correct.

  DATED:  <u>April 14, 2011</u>.    <u>/s/ Diane K. Vaillancourt</u>
                   DIANE K. VAILLANCOURT