1  TERRI KEYSER-COOPER
   LAW OFFICE OF TERRI KEYSER-COOPER
2  California Bar No. 122355
3  3300 Skyline Blvd, No. 274
   Reno, NV 89509
4  775-337-0323

5  DIANE K. VAILLANCOURT
   LAW OFFICE OF DIANE K. VAILLANCOURT
6  California Bar No. 181348
7  849 Almar Ave., Suite C403
   Santa Cruz, CA 95060
8  (831) 458-3440
   *Attorneys for Plaintiffs*

9

10              **UNITED STATES DISTRICT COURT**

11          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

12

13

14  EMORY BOYD, JR., QUINTON HANCOCK,
    and   NICHOLOS PAGE,

15                                          **Case No. 2:11-CV-00231-JAM-EFB**
        Plaintiffs,

16                                          **OPPOSITION TO DEFENDANTS'**
        vs.                                 **MOTION TO DISMISS FIRST AMENDED**
17                                          **COMPLAINT (Rule 12(b)(6))**

18  FEATHER RIVER COMMUNITY COLLEGE
    DISTRICT, MERLE TRUEBLOOD, JOSH         Date:      September 7, 2011
19  WHITE, and JAMES JOHNSON,               Time:      9:30 a.m.
                                            Courtroom:  6
20      Defendants.                         Before:    The Honorable John A. Mendez
    _____/
21

22

23

24

25

26

27

28

---

Boyd v. Feather River Community College District, 2:11-cv-00231-JAM-EFB    Opposition to Motion to Dismiss

I.      PRELIMINARY STATEMENT .................................................................................. 1

II.     STANDARDS GOVERNING RULE 12(b)(6) MOTIONS ....................................... 2

III.    FACTUAL ALLEGATIONS ..................................................................................... 2

    A.    Discriminatory Rejection ................................................................................ 2

        1.    FRC Broke from Precedent by Cutting Plaintiffs and Other Blacks ................... 2

        2.    Plaintiffs Expected to Return to Play for the Team ........................................... 3

            a.    Emory Boyd, Jr. ...................................................................................... 3

            b.    Quinton Hancock ..................................................................................... 4

            c.    Nicholos Page ......................................................................................... 5

        3.    Statistical Showing of Race-Based Culling ..................................................... 6

    B.    Hostile Educational Environment ................................................................... 7

        1.    White's Open, Flagrant Hostility Towards Blacks on Team ............................... 7

        2.    Plaintiffs' Experience of White's Hostility ..................................................... 9

            a.    Emory Boyd, Jr. ...................................................................................... 9

            b.    Quinton Hancock ..................................................................................... 9

            c.    Nicholos Page ....................................................................................... 10

        3.    On Notice of White's Racial Hostility, FRC Officials Failed to Remedy It ....... 11

IV.    LEGAL ARGUMENT ............................................................................................. 12

    A.    Discriminatory Rejection from Team Participation ......................................... 12

        1.    Title VI ................................................................................................... 12

            a.    Federal Financial Assistance ................................................................... 12

            b.    Intentional Discrimination ..................................................................... 13

                1)    Statistical Data Indicates Intentional Discrimation ............................... 13

                2)    "Change-the-Face" Statement Evidences Discriminatory Intent ............... 14

                3)    Unprecedented Rejection of African-American Players .......................... 15

                4)    Worse Treatment of African-American Players .................................... 15

        2.    § 1981 ..................................................................................................... 16

a.   § 1981 Extends to College Athletic Programs ................................................................ 16

b.   Trueblood and Johnson Had Authority to Reject Plaintiffs ............................................ 17

3.   Fourteenth Amendment Equal Protection Clause ............................................................ 18

a.   Same Inquiry re "Intent" Same as for Title VI and § 1981 ............................................ 19

b.   Plaintiffs Specifically Allege Purposeful Discrimination ............................................... 19

B.   Hostile Educational Environment ......................................................................................... 20

1.   Title VI ............................................................................................................................ 20

a.   Racially Hostile Environment ........................................................................................ 20

b.   Notice .............................................................................................................................. 23

c.   Inadequate Response ....................................................................................................... 23

C.   Trueblood and Johnson's Liability Under § 1981 and the Equal Protection Clause ............ 24

E.   White's Liability Under § 1981 and the Equal Protection Clause ........................................ 24

V.   CONCLUSION ............................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Alexander v. Sandoval*, 532 U.S. 275, 279 (2001) 12

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) 13, 14, 19, 20 n.8

*Aronson v. Resolution Trust Corp.*, 38 F.3d 1110, 1112-13 (9th Cir. 1994) 17 n.7

*Association of Mexican-American Educators v. State of California*, 836 F. Supp. 1534, 1540 (N.D. Cal. 1993) 12

*Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) 2

*Barker v. Riverside County Office of Ed.*, 584 F.3d 821, 824 (9th Cir. 2009) 2

*Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) 18

*Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) 2

*Cannon v. University of Chicago*, 441 U.S. 677, 704, 704 n.36 (1979) 12

*City of Canton, Ohio v. Harris,* 489 U.S. 378, 388-92 (1989) 23, 24

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) 18

*Davison v. Santa Barbara High School District*, 48 F. Supp. 2d 1225, 228-29 (C.D. Cal. 1998) 20

*Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 470 F.3d 827, 836-37 (9th Cir. 2006) 17

*Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991) 21

*Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003) 25

*FDIC v. Henderson,* 940 F.2d 465, 471 (9th Cir. 1991) 19

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-86 (1947) 17

*Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996) 16

*Fobbs v. Holy Cross Health System Corporation*, 29 F.3d 1439, 1447 (9th Cir. 1994) 12

1    *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)    24

2    *Gratz v. Bollinger*, 539 U.S. 244, 275 n.23 (2003)    16

3    *Grove City College v. Bell,* 465 U.S. 555, 563-70 (1984)    12 n.2

4    *Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 868 (Fed. Cir. 1987))    17 n.7

5    *Monteiro v. The Temple Union High School District*, 158 F.3d 1022, 1033 (9th Cir.    20-24
6      1998)

7    *Ollier v. Sweetwater Union High School Dist.,* 604 F. Supp. 2d 1264 (S.D. Cal. 2009)    13

8
   *Patterson v. McLean Credit Union,* 491 U.S. 164, 180 (1989    21
9
   *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)    18
10
   *Pryor v. NCAA*, 288 F.3d 548, 569 (3rd Cir. 2002)    16, 17,
11      19 n.8

12    *Radcliff v. Landau,* 883 F.2d 1481, 1482 (9th Cir.1989)    13

13    *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 489 (1997)    14

14    *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2nd Cir. 2009)    2

15    *Rosenbaum v. City and County of San Francisco,* 484 F.3d 1142, 1153 (9th Cir. 2007)    18

16    *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)    16

17    *Shaw v. Reno*, 509 U.S. 630, 643 (1993)    19 n.8

18    *Starr v. Baca*, 633 F.3d 1191, 1204 (9th Cir. 2011)    2

19
   *The Epileptic Foundation, Inc. v. City and County of Maui*, 300 F. Supp. 2d 1003,    18 n.7
20      1017 n.33 (D. Haw. 1003)

21    *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir. 1982)    21

22    *Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989)    21

23    *Washington v. Davis*, 426 U.S. 229, 242 (1976)    19

24    *Wayte v. United States,* 470 U.S. 598, 610 (1985));    18

25

26

27

28

**Administrative Regulations:**

*"Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guide"* (*"DOE Investigative Guidance"*), 59 Fed. Reg. 11448 (DOE Notices, March 10, 1994)      20, 21

## I.  PRELIMINARY STATEMENT

In their First Amended Complaint ("FAC"), African-American plaintiffs Emory Boyd, Jr., Quinton Hancock, and Nicholos Page, allege they were casualties of a calculated, intentional effort by Feather River Community College District ("FRC"), Head Football Coach James Johnson, and Athletic Director Merle Trueblood to reduce the number of African-Americans on the college football team and increase the number of white/non-black players—literally, to "change the face" of the team. Plaintiffs each had travelled from their homes in South Carolina to play football at FRC while earning their Associate of Arts degree. They learned about opportunities there from high school coaches, family members and friends who had attended the school and who, with help from FRC's coaches, had successfully moved on to four-year colleges with football scholarships.

After arriving at FRC, plaintiffs worked hard both in the classroom and on the field. They successfully maintained academic and athletic eligibility to continue playing football for the team in their sophomore year. Historically, all eligible student athletes at the college were invited back to play for their sophomore year. However, in a complete break from precedent, during July and August 2010, Johnson and Trueblood cut plaintiffs and several of their African-American team mates from the roster despite their eligibility to continue. In place of these black student athletes, Johnson and Trueblood recruited new white players to join the team. Overnight Johnson and Trueblood changed the team's racial make-up from predominantly black to predominantly white. Plaintiffs maintain that the before and after numbers are strong evidence of intentional racial discrimination in their rejection.

In addition, plaintiffs allege that, during the semesters preceding their rejection, they were subjected to a hostile educational environment, that one coach in particular, Coach Joshua White, mistreated the African-American team members. White would frequently yell at the black players, curse them, refuse to give them crucial time on the field, and humiliate them in front of the rest of the team. White's practice was to not engage in "constructive criticism" with his black student athletes but rather to reserve his constructive criticism for the white players. White would repeatedly provoke fights with the black players. He would ball up his fists, call them "stupid"

and say to them, "You want to take this outside?" "Do you want to fight me?" "I'll kick your ass," "I'll bust your ass" or "Let's settle this right now outside" – making clear to everyone present how he despised the black players and was trying to get them in trouble. Johnson, Trueblood and other FRC officials were aware of White's mistreatment of the black team members. A head coach acknowledged that he knew White had a "problem" with blacks. But instead of stopping White's misconduct, they shrugged it off, did nothing, and on occasion joined in.

## II.   STANDARDS GOVERNING RULE 12(b)(6) MOTIONS

Courts view with "disfavor" motions to dismiss under Rule 12(b)(6). *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).  On a 12(b)(6) motion, the court must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2nd Cir. 2009). For a complaint to survive a 12(b)(6) motion, what is required is, first, for the allegations to be "sufficiently detailed to give fair notice to the opposing party of the nature of the claim;" and, second, for them to be "sufficiently plausible" to warrant the expense of discovery. *Starr v. Baca*, 633 F.3d 1191, 1204 (9th Cir. 2011).  Thus, the issue to resolve is whether the facts pleaded would, if established, support a plausible claim for relief. *Barker v. Riverside County Office of Ed.*, 584 F.3d 821, 824 (9th Cir. 2009). When the defendants' motion to dismiss is made as an initial response, as here, and there is no evidentiary hearing, the plaintiff need only make a prima facie showing. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

## III.   FACTUAL ALLEGATIONS

### A.   Discriminatory Rejection

#### 1.   FRC Broke from Precedent by Cutting Plaintiffs and Other Blacks

Historically, FRC had a practice of inviting back ***all*** players who were eligible to continue playing football in their sophomore years (See FAC, ¶51). In a complete break from precedent, FRC, Trueblood and Johnson cut African-American plaintiffs from the team roster just as the school year was about to start, in late July and early August 2010 (¶51). Plaintiffs were eligible to continue playing both academically and athletically, but being eligible to return made no difference for them

(¶38). They were part of a larger group of returning African-American student athletes who were similarly cut on the eve of the fall 2010 semester. Eighteen of twenty-one rejected returning players were African-American (¶48). Plaintiffs were given no rationale or explanation over why they were selected for cutting (¶42). Being cut at the last moment left plaintiffs with few options for continuing their education.

### 2. Plaintiffs Expected to Return to Play for the Team

After a successful spring semester on FRC's football team, each of plaintiffs left for summer break expecting to return in the fall to play another year on the team, complete their degree requirements, and obtain promised assistance to transfer to a four-year college on scholarship (¶39). They had been advised they would be notified during the summer break of their invitations to return for the fall season (¶86). Having maintained academic and athletic eligibility for team participation, they fully expected to be invited back for their sophomore year. Each had received compliments from their coaches for their work ethic and performance (¶61, ¶75, ¶86).

### a. Emory Boyd, Jr.

Plaintiff Emory Boyd, Jr. came to FRC from South Carolina in or about August 2009 (¶57). An out-of-state student, he paid full tuition (¶13). Boyd heard about opportunities at FRC from cousins who had gone to school there and had positive experiences (¶57). His cousins, as well as his high school coach, told him that, if he performed well academically and athletically, he would graduate with an Associate of Arts degree and FRC would utilize its best efforts to place him in a four-year college with a football scholarship (¶57-¶58). A defensive linebacker, Boyd worked out with the team throughout the 2010 spring training, followed all instructions, worked out at least four hours each day and made huge improvements in each and every area, including speed, coverage, and strength, BOYD made huge improvements (¶61). His primary coach, Coach Johnson, led him to believe he would continue on the team as an active player in the fall 2010 season (¶59, ¶61).

After returning to South Carolina for the summer, Boyd made over ten phone calls to Coach Johnson to confirm his status on the team the following semester (¶62). Johnson, however, failed to respond (¶62). Boyd was not concerned about continuing on the team because he had worked hard,

performed well, and the coaches had led him to believe he would be returning in the fall (¶62). In addition, Boyd had been advised that it was the practice at FRC to invite back all eligible players (¶62). In late July 2010, Boyd received a text message from Johnson stating "looking forward to seeing you in August" (¶63). Thus assured his spot on the team, Boyd returned from South Carolina in August 2010 to attend football camp (¶64). He met all requirements and attended all practices and football classes (¶64). However, at football camp, he became concerned that the coaches were giving him very little opportunity to perform (¶64). Boyd sought assurances from Johnson that he was still on the team, and Johnson assured him he was (¶65).

Then, after the fall semester arrived, Boyd's name was omitted from the roster for required football classes and he was not enrolled in the football program as is necessary for all team members (¶65). Boyd knew he was not officially on the team unless and until his coaches permitted him to sign up for football classes and enroll in the program (¶67). He tried several times to add his name to the required classes, repeatedly approaching Coach White and others. He dutifully obtained signatures from Johnson and White, turned in his add-slips, and took the signed add-slips to the Dean of Instruction, Dr. Bagley. But he was never able to get himself properly signed up. Each time he approached his coaches, they told him they would "get to it" but instead brushed him off (¶66, ¶67). While continuing his attempts to enroll, Boyd continued to attend all football classes and practices. In or about October 2010, Boyd reviewed his records on the internet and realized that he was not receiving credit for football and that his participation on the team was of no account (¶67). He realized he been fooled into returning to FRC to pay tuition and attend classes based on a false promise that he was on the team when the college had no intention of keeping him in the program (¶69). Boyd was so shocked and devastated at this discovery that he suffered a nervous breakdown and had to be hospitalized. Upon being released from the hospital, he went home to South Carolina (¶70).

### b. <u>Quinton Hancock</u>

Plaintiff Quinton Hancock, also from South Carolina, came to FRC in January 2010 (¶72). He had learned about FRC's football program from his brother Ray Davis, a former team member

(¶71, ¶79). Impressed by the success of other former FRC team members, he was made to believe the FRC coaches were dedicated to helping their players advance to four-year schools (¶71, ¶73). Like Boyd, Hancock's goal was to perform well both academically and on the field and earn a football scholarship to a four-year college (¶71).

An outside line backer on defense, Hancock trained, conditioned and participated in all daily practices (¶73). Hancock worked hard to get good grades and went to all practices. He was a vital member of FRC's football team and was progressing towards his athletic and academic goals. He had reason to believe he was one of the top linebackers on the team (¶73). In addition, he maintained a GPA of nearly 3.0 (¶74). His coaches complimented him on his performance, dedication and work ethic and assured him he would be returning to play for them in the fall (¶75).

On returning home to South Carolina for summer 2010 – like Boyd – Hancock proceeded to call FRC's coaches repeatedly to confirm his continued placement on the team and his calls were not answered nor returned (¶79). Still believing his spot on the team was assured, Hancock returned to FRC in August 2010. Only then did he learn he was cut from the team (¶80). Hancock felt he had no choice but to remain at FRC to complete his academic program. No longer on the team, his opportunity for a football scholarship to a four-year school was gone. Had he known he was being cut, he would not have returned to FRC (¶81).

c.    **Nicholos Page**

Plaintiff Nicholos Page – like Boyd and Hancock – arrived at FRC from South Carolina in fall 2008 (¶82).   In deciding to attend FRC, Page relied on promises by its coaches of an opportunity to play collegiate football and, if he worked hard, earn an athletic scholarship to a four-year school (¶82). Page completed required academic credits and maintained his GPA above the 2.0 eligibility requirement (¶84). An offensive guard, he was a solid player who improved consistently with practice during the 2009-2010 season (¶85). Following the 2009 season, then head coach Mooshagian told him he "would be more than happy to have him back" on the team in the upcoming fall (¶86). It was at all times understood at FRC that all returning football players would continue to play on the team so long as they remained academically and athletically qualified (¶87).

So certain was Page that he would return to play football that his family made travel plans to fly to California to attend homecoming in October 2010 (¶88).

Like Boyd and Hancock, Page learned he was cut from the team on the eve of the fall 2010 semester. He had been emailing Coach Johnson – who had been promoted to head coach in July 2010 – and asked what was going on, why hadn't he heard from him, was he for sure being invited to return (¶89). On July 28, 2010, Page again emailed Johnson to confirm if he was invited back for football (¶89). He needed confirmation in order to finalize his plane reservations and arrangements for housing and financial aid (¶89). Johnson emailed him back that the roster was full and he would no longer be needed. Page was extremely upset. It was too late for him to arrange classes at another college and continue playing football (¶90). Page remained home in South Carolina and attempted to take classes online and complete his Associates degree remotely (¶95). He began to experience physical symptoms consistent with depression (¶90).

### 3. Statistical Showing of Race-Based Culling

The First Amended Complaint further alleges that Boyd, Hancock and Page were casualties of FRC's determination to eliminate the African-American presence on its football team by rejecting a disproportionate number of black players while inviting whites and non-blacks to take their places (¶45, ¶46). As the following chart illustrates, in the 2009-2010 season, the team had a roster of approximately 99 players of whom 72 (73%) were black and 27 (27%) were white/non-black (¶47). Immediately on being made head coach, during July 2010, Johnson, with Trueblood's support and assistance, cut the number of African-American players by more than half while nearly doubling the number of whites (¶47). FRC's autumn 2010 football roster included 78 players of whom 31 (40%) were black and 47 (60%) were white/non-black (¶47).

|  | **2009-2010 Season** | **2010-2011 Season** |
|---|---|---|
| **African-American** | **72 (73%)** | 31 (40%) |
| **White/Non-Black** | 27 (27%) | **47 (60%)** |
| **Total** | 99 (100%) | 78 (100%) |

As the chart demonstrates, following Trueblood and Johnson's recruiting efforts and rejection of African-American players, the racial composition of the football team changed drastically (¶50). This unprecedented transformation was effected by cutting 18 returning African-American players including Boyd, Hancock and Page. Of the 21 players who were cut from the team, only 3 were white. ***Thus, 86% of the returning players who Johnson and Trueblood cut were African-American players like plaintiffs*** (¶48).

The racial recomposition of FRC's Golden Eagles team was further achieved by Trueblood and Johnson's inviting 36 new white/non-black recruits to join the team (84%) and only 7 black (16%) for a total of 43 new recruits. ***Whereas before, approximately 80% of new players were black, in 2010 – in a complete reversal under Johnson – more than 80% of new recruits were white and only 20% were black*** (¶49). This major deviation from prior years' practice of welcoming interested African-American student athletes is an indicator of intentional racial discrimination in the unprecedented rejection of plaintiffs (¶49, ¶51).

**B.**    **Hostile Educational Environment**

    **1.**    **White's Open, Flagrant Hostility Towards Blacks on Team**

Plaintiffs experienced a racially hostile environment on FRC's football team well before they were actually cut. They witnessed FRC coach Josh White repeatedly "pick on," unfairly criticize, and made "insulting personal remarks" singling out their fellow African-American players(¶20). Coach White would frequently harass certain African-American players in the presence of the entire team, verbally abuse them, taunt them and provoke them to engage in physical fights (¶20). By contrast, White typically treated the team's Caucasian players in a conciliatory, respectful, appropriate manner, and he did not similarly verbally abuse, taunt or attempt to provoke the team's Caucasian players physically to fight him (¶20).

White frequently yelled at the black student players, especially those recruited by African-American Coach Small, cursed at them, refused to play them, and humiliated them in front of the entire team on a regular basis (¶23). His angry comments were not occasional or sporadic but part of his regular routine when interacting with the black student athletes. White did not engage in

"constructive criticism" for these black student athletes, but reserved his constructive criticism for his white players (¶23). Singling out the black players for criticism, White called them "stupid,", and made his open disgust for their blackness obvious to all – the team's players, other coaches, administrators, and Small (¶23). White made clear his preferences for the white players, giving inferior-playing white players more time on the field and regularly sidelining black players with superior athletic ability in favor of poorer performing white players (¶23). White would openly insult the African-American coach Small, denigrating him freely in front of plaintiffs and other team members (¶24). When Small complained of White's mistreatment of the African-American players, head coach Mooshagian acknowledged that White had a "problem with blacks" and shrugged it off (¶29).

In addition, White repeatedly provoked fights with the black student athletes (¶25). He frequently balled up his fists, called them "stupid" and said: "You want to take this outside?" or "Do you want to fight me?" or "I'll kick your ass" or "I'll bust your ass" or "Let's settle this right now outside" – making it clear to everyone present including plaintiffs that he was ready, willing, and able to physically fight the black students he so openly despised (¶25). White attempted to fight plaintiffs' teammates, black students Brandell Gilbert, Ronny Williams, Emile Sengor, Obie Donne, Bliel Leggett, Mike Alexander, Andrew Bowden and Don Briggman (¶28). In each instance, White aggressively and without provocation attempted to goad the black athletes to fight physically with him, which would have had them kicked off the team (¶28). He provoked them and taunted them—conduct that was known to everyone within the football program including Johnson, Trueblood, and Mooshagian. White was never observed talking in similar manner to white players or attempting to goad them into physical fights (¶28).

White would ridicule the southern accents of the black student athletes. He imitated a southern black accent and used the word "y'all" in an insulting derogatory manner (¶30). He also called the black players "pussy," "dickhead," "sons of bitches," "bitch," "no good son of a gun," reserving his derogatory epithets for the black players. Trained to avoid referring to the black players by openly racial terms such as the "N*" word, White used other words as a proxy or code

for racial epithets (¶25). Reserving his disdain for the black players, White did not call the white student athletes these derogatory names (¶25).

White would threaten the black players and say (to the effect): "I'm going to kick you off the team. You won't be invited back. You black players aren't what you're cracked up to be. I'm going to get rid of you, and don't you forget my reputation around here" (¶31). White's threats were shocking to coach Small and the black student athletes he had encouraged to come to FRC. Never before had they seen an adult coach intentionally pick fights with students (¶31). Small and the African-American players would rally around their provoked teammate, urging him to "calm down" and ignore White's goading. A student who engages in "fights" with a coach faces severe repercussions (¶31). White's conduct occurred on a regular basis. His open racial hostility towards the African-American players created a racially abusive team environment for plaintiffs (¶26-¶27).

### 2. Plaintiffs' Experience of White's Hostility

#### a. Emory Boyd, Jr.

While practicing with the team and attending trainings, Emory Boyd, Jr. observed White and how he interacted with the players as described above (¶60). Boyd perceived how White had effectively created two classes of players on the team: white versus black with the black players being treated differently from and worse than the white players (¶60). He was upset at seeing White play inferior white players over better performing black players (¶60). White's racial hostility struck Boyd as exceedingly unfair and made him uncomfortable, severely distressed, and emotionally upset (¶60).

#### b. Quinton Hancock

Quinton Hancock witnessed Coach White trying to fight various black members of the team and talking disrespectfully to them—in a manner far worse than anything he had seen or heard before in his life (¶76). White cursed at the black players constantly in Hancock's presence, especially those recruited by African-American Coach Small (¶76). Like Boyd, Hancock was uncomfortable around White's show of racial hostility (¶76).

Additionally, Hancock observed Johnson show hostility toward the black players. Like White, Johnson would avoid talking with the black players regarding team matters while, by contrast, he freely talked with the white players (¶77). Hancock had never before experienced coaches excluding certain team members from participation based on their race. This conduct by White and Johnson made him very uncomfortable (¶77).

### c.  Nicholos Page

A defensive player, Nicolos Page, had White as his coach. He was repeatedly exposed to White's show of racial bias against his black players and preference for the white players (¶91). White made known to his players including Page his special dislike and disgust for the black players from southern states who were encouraged to attend FRC by African-American coach Small (¶91).

Page personally witnessed White attempting to provoke black players to fight with him in physical altercations (¶92). Page had never before seen a coach pick on minority athletes and goad them into fights as did White (¶92). Page well knew that, if a player were to strike a coach, he would be immediately removed from the team, and he perceived that White was goading black players to strike him, or attempt to do so, as a way to have the student ejected from the team (¶92). Page heard White call his African-American teammates "pussy," "dickhead," "bitches," "sons of bitches," "no good son of a gun" and other insulting names (¶92). White did not call the white players by those names (¶92).

Page tried to talk to White regarding coaching issues – after all White was his coach – but White refused to give him the benefit of his coaching advice (¶93). Page saw that White had effectively created two classes of players: white and black with black players like himself being treated different from and worse than the white players (¶93).

White frequently would give inferior playing white players time on the field and while keeping better playing black players including Page on the sideline (¶91). Even though Page was one of the better defensive players, White refused to allow him to play in games, favoring non-minority players where possible (¶94). Page practiced with the team and was in position to compare

his abilities to the abilities of other players—from this, he was easily discerned that the white players White put into games demonstrated less commitment and skills (¶94). Page needed to play so he could obtain "film" which would be used to send to four-year schools to attract scholarship offers. Without experience on the field, Page could not obtain the necessary highlights film whereas the white players, who were given play time, were able to do so (¶95).

### 3. On Notice of White's Racial Hostility, FRC Officials Failed to Stop It

White made clear from the beginning of his employment with FRC that he was hostile to Small's African-American recruits. White demonstrated his racial hostility at FRC's first scrimmage in which he physically grabbed a black student player, pushed him, yelled and cursed at him without justification. The subsequent investigation concluded the player had done nothing to warrant White's vitriolic attack. Yet White was never disciplined and was allowed to continue (¶21-¶22).

FRC officials were on notice of White's racial hostility toward the African-American players. White's conduct was reported to several FRC officials by coach Small, including dean of instruction Michael Bagley, athletic director Merle Trueblood, former head coach Steve Mooshagian, head coach James Johnson, Marie Enriquez, interim dean of students Lisa Kelly and human resources director Jamie Canon (¶35). Bagley assured Small that White's picking fights with the black students was "noted" in his file but he took no action to stop it (¶35). Trueblood told Small he would "look into it," laughed about it and did nothing (¶35). Mooshagian responded to Small's complaint by laughing and acknowledging, "Josh White can't coach black players" (¶29, ¶35). Johnson, like Trueblood, said he would "talk" to his boss Mooshagian but nothing came of it (¶35). Kelly took no action to remedy the conduct (¶35). Finally, Canon insisted there was nothing she could (or would) do about White picking fights with the black students because she had not received an "official report" (¶35). Thus White was never disciplined for his conduct and the conduct did not stop (¶35).

# IV.    LEGAL ARGUMENT

## A.    Discriminatory Rejection from Team Participation

### 1.    Title VI

Plaintiffs allege that FRC violated their right to be free of racial discrimination in the administration of its football program. Title VI contains a broad prohibition on the use of federal dollars to subsidize racial discrimination in educational programs or activities:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Title VI, 42 U.S.C. §2000d.

Congress passed Title VI "to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices." *Cannon v. University of Chicago,* 441 U.S. 677, 704, 704 n.36 (1979). The terms "program or activity" have expansive definitions. *Association of Mexican-American Educators v. State of California*, 836 F. Supp. 1534, 1540 (N.D. Cal. 1993). In addition, private individuals may sue to enforce Title VI and obtain damages for intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). To state a Title VI claim for damages, "a plaintiff need only allege that (1) the entity involved is engaging in [intentional] racial discrimination; and (2) the entity involved is receiving federal financial assistance."[1] *Fobbs v. Holy Cross Health System Corporation,* 29 F.3d 1439, 1447 (9th Cir. 1994).

### a.    Federal Financial Assistance

With respect to federal financial assistance, plaintiffs properly allege that defendant FRC is a recipient of federal funds (¶11) and also that they each received financial aid to enroll at FRC (¶14).[2] To be protected under Title VI, a plaintiff need not plead that he was an intended beneficiary of the federally funded program. *Fobbs*, 29 F.3d at 1447. Defendants do not deny that FRC receives federal financial assistance subjecting it to Title VI requirements.

---

[1] Defendants do not dispute plaintiff's allegations that FRC is an entity receiving federal financial assistance.

[2] Drafters of Title VI envisioned that the receipt of student aid funds would trigger Title VI coverage. *Grove City College v. Bell,* 465 U.S. 555, 563-70 (1984).

### b.    Intentional Discrimination

With respect to intentional discrimination, plaintiff's properly allege that defendants engaged in intentional racial discrimination by rejecting them from continued team membership based on their race. A determination whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into circumstantial and direct evidence indicating intent. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

### 1)    Statistical Data Indicates Intentional Discrimation

One way courts find discrimination in program expansion, benefits, or activities is through review of statistical data comparing protected classifications against those that are not. See *Ollier v. Sweetwater Union High School Dist.,* 604 F. Supp. 2d 1264 (S.D. Cal. 2009). In *Ollier,* the court reviewed statistical data and participation rates of females versus males to determine if the school unlawfully discriminated against the plaintiff females. While *Ollier* is a Title IX case involving gender discrimination, Title VI and Title IX are similarly analyzed because Title IX was "patterned after" Title VI. *Radcliff v. Landau,* 883 F.2d 1481, 1482 (9th Cir.1989).

In the case at hand, plaintiffs set forth factual allegations stating numbers and percentages of African-American versus non-African-American players on FRC's football team both before and after Johnson was made head coach in late July 2010.[3]   The before and after statistics make a plausible claim of intentional racial discrimination given that plaintiffs were among predominantly African-American players that Johnson cut after becoming head coach. In the transition between two football seasons, ***Trueblood and Johnson reduced the team's African-American presence by more than half (from 72 to 31 black players) while nearly doubling its non-African-American presence (from 27 to 47 white players).***

These defendants accomplished the reduction of the African-American presence on the team in two ways: first, by disproportionately cutting qualified black returning players including plaintiffs; and, second, by recruiting new white players to join the team in their places while

---

[3] That same summer, FRC rejected African-American assistant head coach Eric Small was rejected for the head coach position and selected Caucasian stipend coach Johnson in his place despite Small's superior qualifications and the well-established practice at FRC of promoting the assistant head coach to the interim head coach position. See *Small v. Feather River College*, Case No. 2:10-CV-3026-JAM-GGH, United States District Court, Eastern District of California.    13

rejecting black recruits. As for the first – the cutting of eligible returning players – plaintiffs set forth the extremely high percentage of returning black players who were cut from the team (86%) by contrast with the extremely low percentage of similarly situated whites who were cut (14%). As for the second – the simultaneous invitations to new white recruits – plaintiffs set forth the extremely high percentage of new white recruits who were invited to play on the team (86%) by contrast with the very low percentage of new black recruits (14%).[4] This was a complete reversal of prior trends where African-American players were welcomed. Whereas before, African-Americans were encouraged to attend FRC and play football for the school, after Johnson became head coach, eligible African-American players were rejected from the team. The figures set forth by plaintiffs show how in a matter of weeks, by limiting the team roster, cutting blacks and recruiting whites in their place, defendants transformed FRC's football team from a predominantly African-American team to a predominantly white team.

These stark figures showing the impact of Trueblood and Johnson's selection of team members are probative of their discriminatory intent towards the African-American plaintiffs. As the Supreme Court has found, an "important starting point" for assessing discriminatory purpose is the "impact of the official action" and "whether it bears more heavily on one race than another." *Arlington Heights,* 429 U.S. at 266; *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 489 (1997). The "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Bossier Parish School Bd.*, 520 U.S. at 487.

### 2) "Change-the-Face" Statement Evidences Discriminatory Intent

Other considerations relevant to the inquiry into discriminatory intent include the "historical background of the. . .decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; and the legislative or administrative history, especially . . . [any] contemporary statements by members of the decisionmaking body." *Bossier Parish School Board*, 520 U.S. at 487; accord *Arlington Heights*, 429 U.S. at 267-68. In the case at hand, Trueblood announced his intent to "change the face" of the team. Trueblood's statement

---

[4] Coincidentally (or not), the exact percentages turned out to be the same.

reveals that the transformation of the team's racial make-up was not accidental, but a deliberate, intentional, and discriminatory program of adding white faces to the team while reducing the black ones.

### 3) Unprecedented Rejection of African-American Players

In addition, historically, Trueblood and Johnson's abrupt rejection of the African-American players was unprecedented. Never before had qualified returning football players ever been rejected from the FRC's football team – neither white nor black. Previously, every student who was qualified academically and athletically was permitted to continue as a member of FRC's football program. The policy has always been that all returning players who met academic requirements and did well on the field were invited to play their second year. Moreover, the team roster had never before been closed. It was closed only after Trueblood announced the school's intention to "change the face of the team." Trueblood and Johnson's rejection of qualified returning African-American players was a complete break from precedent (¶12, ¶51). This deviation from normal policy is further indicative of discriminatory purpose behind the rejections.

### 4) Worse Treatment of African-American Players

Finally, defendants' discriminatory motive may be demonstrated by the coaches' worse treatment of African-American players by contrast with a show of favoritism toward the whites. Coach White, an acknowledged racist, taunted the African-American players. He cursed at them, demeaned them, insulted them, and mocked their accents. He refused to play them on the field while allowing white players who were inferior to have "play time." He picked "fights" with the black players, egging them on to provoke a physical encounter, which of course would have resulted in their ejection from the team (¶19-¶32, ¶60, ¶76, ¶91-¶95).

In addition, plaintiffs allege that other coaches, including Trueblood and Johnson, knew of White's racial hostility and shrugged it off. Former Head Coach Mooshagian admitted that White had a problem with "blacks" but did nothing to correct his behavior. Despite numerous complaints, White's misconduct towards the African-American players was never remedied. Head coach Johnson engaged in certain of the same behaviors as White. Johnson played inferior white players

and gave them opportunities for "film" while keeping better performing African-American players on the sidelines. Johnson too avoided responding to his African-American players, excluding them from the benefit of his coaching, but freely interacted with the whites (¶19, ¶77).[5]

## 2. § 1981

In alleging racial discrimination in admission to Feather River College's football program, plaintiff's invoke 42 U.S.C. § 1981 to hold the individual wrongdoers accountable for their discriminatory conduct. Individual defendants Trueblood and Johnson may be held liable under § 1981 for their roles in cutting plaintiffs from the football team. The Ninth Circuit has found that "§ 1981 contains an implied cause of action against state actors." *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996). There is no dispute that defendants Trueblood and Johnson are state actors accountable under § 1981.

To establish a right to relief under § 1981, a plaintiff must show: (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981, including the right to make and enforce contracts. *Pryor v. NCAA*, 288 F.3d 548, 569 (3rd Cir. 2002). As for the first requirement, plaintiffs have alleged they belong to a racial minority. They are African-American. As for the second, the standard for establishing an "intent to discriminate on the basis of race" is identical in the Title VI and § 1981 contexts. *Id.* Based on the above discussion of Title VI, plaintiffs have properly alleged these defendants' intent to discriminate.

### a. § 1981 Extends to College Athletic Programs

The third requirement – that plaintiffs allege discrimination in "the right to make or enforce contracts" – is unique to § 1981. It has long been established that 42 U.S.C. § 1981 prohibits racial discrimination in admission to educational programs. *Runyon v. McCrary*, 427 U.S. 160, 172 (1976). Specifically addressing § 1981's "contract" requirement, the Supreme Court has made clear that "a contract for educational services is a 'contract' for purposes of *§ 1981*." *Gratz v. Bollinger*, 539 U.S. 244, 275 n.23 (2003). Ignoring this mandatory Supreme Court precedent, defendants take a too narrow view derived from contract law and not civil rights. They assert that § 1981 requires an

---

[5] See below for a more comprehensive discussion of White's racial hostility.

"express contract to play football for the District." (Def. Br. pg. 14:28-15:1). In support, they cite to a case addressing wheat crop insurance contracts and ignore the full body of federal anti-discrimination law (Def. Br. pg. 14:28-15:5, citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-86 (1947)).[6]

It is well-established that § 1981 does not require an "express contract" with signatures on the dotted line. To require such would be to deny a vast body of case precedent giving an expansive view of § 1981's contract protections. In *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 470 F.3d 827, 836-37 (9th Cir. 2006), the Ninth Circuit *en banc* addressed the scope of § 1981's "contract" protection in the educational context:

> Section 1981 largely lay dormant for nearly a century when, in 1976, the Supreme Court reinvigorated the statute in *Runyon*. In *Runyon*, the Supreme Court faced the question whether § 1981 prevents "private, commercially operated, nonsectarian schools from denying admission to prospective students because they are Negroes," 427 U.S. at 168, and held that it does, *id.* at 172-73. The parents of African-American children had sought to enter into contractual relationships with the schools. "Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments." *Id.* at 172. The schools' refusal to admit them therefore "amount[ed] to a classic violation of § 1981." *Id.*

It is also well-established that § 1981's protections extend to college athletic programs such as the football program at issue in the instant case. See *Pryor v. NCAA*, 288 F.3d at 569-70. Thus, to set forth a proper § 1981 claim, it is sufficient that plaintiffs in this case sought to enter a contractual relationship with FRC wherein they expected to be able to participate fully in the college's athletic program on the same terms as the college's non-black students.

### b. Trueblood and Johnson Had Authority to Reject Plaintiffs

Finally, defendants assert that plaintiffs must show that the person who made the "contract" had the authority to do so on the District's behalf. In response, plaintiffs have alleged that Athletic Director Trueblood and Head Football Coach Johnson exercised the authority given them by FRC

---

[6] Defendants also erroneously rely on a case concerning employment contracts with federal savings associations and government contracts for provision of building insulation as governed by the Code of Federal Regulations. (See Def. Br. pg. 15:7-21 (citing *Aronson v. Resolution Trust Corp.*, 38 F.3d 1110, 1112-13 (9th Cir. 1994) and *Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 868 (Fed. Cir. 1987)). Along these same lines, California Education Code provisions addressing ratification of contracts and scholarships has no bearing on plaintiffs' § 1981 federal discrimination claim. (See Def. Br. pg. 15:15-17).

to both recruit and reject student athletes for the college's football program, further that they misused their authority to reject plaintiffs based on their race. Pursuant to "the contractual relationship" as contemplated by § 1981's anti-discrimination provision, FRC received (or would have received) payments from plaintiffs for services rendered, and, in return for these payments, plaintiffs were entitled to participate in all of FRC's educational programs free of racial discrimination. Trueblood and Johnson's discriminatory rejection of plaintiffs amounts to a violation of the contractual relationship as anticipated under § 1981.

### 3. Fourteenth Amendment Equal Protection Clause

Trueblood and Johnson may also be held liable for violations of the Equal Protection Clause of the Fourteenth Amendment. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted).

To state a claim for relief under the Equal Protection Clause, plaintiffs must allege that "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). To show discriminatory purpose, a plaintiff must establish that "the decision-maker. . .selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Rosenbaum v. City and County of San Francisco,* 484 F.3d 1142, 1153 (9th Cir. 2007) (quoting *Wayte v. United States,* 470 U.S. 598, 610 (1985)); see also *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979).[7]

_____

[7] "The injuries giving rise to Title VI and equal protection claims are somewhat different. For equal protection, the injury is being discriminated against by the state for an impermissible reason. For Title VI, the injury arises when a person is excluded from participation in, denied the benefits of or subjected to discrimination under any program or activity receiving federal funding because of race, color or national origin. See *42 U.S.C. § 2000d*. Accordingly, the underlying facts in Plaintiffs' Title VI and equal protection claims (and the parties with standing to assert those claims) are not perfectly parallel. But the evidence of intentional discrimination. . .satisfies Plaintiffs' burden as to motive for both claims." *The Epileptic Foundation, Inc. v. City and County of Maui*, 300 F. Supp. 2d 1003, 1017 n.33 (D. Haw. 1003).

*Boyd et al. v. Feather River College et al.* – OPPOSITION TO MOTION TO DISMISS

## a.    Same Inquiry re "Intent" Same as for Title VI and § 1981

As with the inquiry into Title VI and § 1981, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266. "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 262. "The specific sequence of events leading up to the challenged decision also may shed some light on the decision-maker's purposes. *Id.* "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Id.* "Beyond this requirement of showing intentional discrimination, however, there is no specific test that an equal protection plaintiff is required to meet." *FDIC v. Henderson,* 940 F.2d 465, 471 (9th Cir. 1991).

## b.    Plaintiffs Specifically Allege Purposeful Discrimination

Make no mistake. This case "purposeful and intentional acts of discrimination based on [plaintiffs'] membership in a particular class" – African-American. (See Def. Br. 16:4-8 (citing *Forrester v. White*, 846 F.2d 29, 32 (7th Cir. 1988)). An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the decision at stake bears more heavily on one race than another. *Washington v. Davis*, 426 U.S. 229, 242 (1976). "Sometimes a clear pattern, unexplainable on grounds other than race emerges from the effect of state action even when the governing legislation appears neutral on its face." *Village of Arlington Heights,* 429 U.S. at 266. In this Rule 12(b)(6) motion, it is premature to weigh the evidence. It is sufficient that plaintiff allege a prima facie case of intentional discrimination. Plaintiffs have alleged that they were qualified both academically and athletically to participate on FRC's football team and that they were cut from the team as part of an intentional effort to alter the team's racial composition, diminish the African-American presence and increase the white presence on the team. This is sufficient to allege a violation of equal protection at this stage of the proceedings.[8]

---

[8] Once plaintiffs set forth a prima facie case of discriminatory purpose based on race, the defendants will be required to come forward and show their decision survives strict scrutiny, i.e., that they had a compelling interest in applying a race-based classification and this classification is narrowly tailored to achieve that compelling interest. *Pryor v. NCAA*, 288 F.3d at 562; see also *Shaw v. Reno*, 509 U.S. 630, 643 (1993). "Racial classifications, well intentioned or not, must

**B.** **Hostile Educational Environment**

Plaintiffs further allege that, during the semesters preceding their formal rejection from the team, they were subjected to a hostile educational environment.

### 1. Title VI

In *Monteiro v. The Temple Union High School District*, 158 F.3d 1022, 1033 (9th Cir. 1998), the Ninth Circuit found that Title VI provides a cause of action for a racially hostile environment in an educational program or activity receiving federal funds. The court reasoned that the Department of Education regulations interpreting Title VI prohibit racial harassment. See *"Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guide"* (*"DOE Investigative Guidance"*), 59 Fed. Reg. 11448 (DOE Notices, March 10, 1994). The regulations prohibiting racial harassment take into consideration "the unique setting and mission of an educational institution":

> An educational institution has a duty to provide a nondiscriminatory environment that is conducive to learning. In addition to the curriculum, students learn about many different aspects of human life and interaction from school. The type of environment that is tolerated or encouraged by or at a school can therefore send a particularly strong signal to, and serve as an influential lesson for, its students.

*DOE Investigative Guidance*, 59 Fed. Reg. at 11449*; see also* *Davison v. Santa Barbara High School District*, 48 F. Supp. 2d 1225, 228-29 (C.D. Cal. 1998).

The elements of a racially hostile educational environment claim under Title VI are: (1) a racially hostile environment; (2) actual or constructive notice to the District; and (3) a "fail[ure] to respond adequately to redress the racially hostile environment." *Monteiro,* 158 F.3d at 1033 (citing 59 Fed. Reg. 11449).

### a. Racially Hostile Environment

In *Monteiro*, the Ninth Circuit defined a "racially hostile environment" as one in which racial harassment is so severe, pervasive or persistent as to interfere with or limit the ability of an individual to participate in or to benefit from the services, activities, or privileges provided by the

---

survive the burdensome strict scrutiny analysis because 'absent searching judicial inquiry. . .there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Arlington Heights*, 429 U.S. at 266. That inquiry is not appropriate in a Rule 12(b) motion, which concerns itself only with the question whether plaintiffs allege a prima facie case.

educational institution. The court found the existence of a hostile educational environment to be a question of fact that is to be determined by reference to the totality of the circumstances:

> Whether a hostile educational environment exists is a question of fact, determined with reference to the totality of the circumstances, including the victim's race and age. Racial harassment creates a hostile environment if it is sufficiently severe that it would interfere with the educational program of a reasonable person of the same age and race as the victim.

*Monteiro,* 158 F.3d at 1033 (citing 59 Fed. Reg. 11449); see also *Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991) (holding that "reasonable person" in female's sexual harassment suit is a "reasonable woman").

For a hostile educational environment to exist, it is not necessary for the race-based hostility to be directed at the complainant. *Monteiro,* 158 F.3d at 1034 (citing 59 Fed. Reg. 11449-50); see also *Patterson v. McLean Credit Union,* 491 U.S. 164, 180 (1989) (racial harassment directed at others in workplace is actionable under Title VII); *Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989) (sexual graffiti not directed at plaintiff relevant to show hostile work environment); *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir. 1982) (racial harassment directed at others relevant to establish hostile work environment under Title VII).

In view of the factual allegations described above, there can be no doubt that plaintiffs' amended complaint alleges a racially abusive environment for plaintiffs, complete with vindictive taunting, repeated ridicule and insults—the mocking of the African-American players' southern black accents, derisive name-calling, provocations to fight and other hostile conduct directed solely at the African-American student athletes. With the repeated insults, White marked these minority students as lesser deserving of the benefits of FRC's football program than whites. Plaintiffs were members of a team in which their African-American teammates were routinely subjected to this abuse while their Caucasian teammates were spared the belittling treatment and treated with respect and given the full benefit of team participation.

Defendants assert that plaintiffs cannot show that the abuse was race-based (Defendants' Br. pg. 8-10). They ignore the admission by head coach Mooshagian that White had a "problem with blacks." They ignore how White would frequently mock the black team members' southern black

accents. They ignore that White reserved his vicious name-calling for his black players and did not similarly call his white players "pussy," "dickhead," "sons of bitches," and "no good son of a gun." They ignore the far different, far better coaching experience White accorded his white players, giving them constructive criticism while denying the black players the same benefit of his coaching expertise and giving inferior playing white players opportunities on the field while keeping his better performing black players on the benches.

Defendants argue that there can have been no harassment or hostile environment because decisions were made by coaches on the field are "for budgetary reasons" or necessary for management purposes (Defendants' Br. pg. 10-11). This is a bogus justification for inexcusable conduct. The racially derogatory conduct White is alleged to have engaged in is inexcusable not only morally, but also legally and in violation of plaintiffs' civil rights. His abuse of authority over the African-American student athletes cannot by any stretch of imagination be attributed to legitimate budgetary or personnel decisions. Along the same lines, the refusal by FRC officials to discipline White or in any way correct the hostile environment he created for his African-American players may not be excused as a personnel or management decision.

It must not be forgotten that plaintiffs are young adults who relied on their coaches for guidance and assistance in furthering their educational and athletic goals. They did not attend FRC to be made to feel lesser deserving of educational and athletic opportunities, to have to witness their African-American teammates be picked on by a coach and belittled on account of their race, or to feel threatened because their coach had a "problem with blacks" and nobody would do anything about it. They were there for the singular purpose of obtaining an education and benefitting from the college's football program. They sought appropriate guidance from the school's coaching staff to develop into responsible adults, and instead faced a dispiriting environment where the purportedly responsible adult made clear his disdain for members of their race.

From his position of authority, coach White abused his authority and did his utmost to undermine the African-American student athletes he was to mentor and guide. In the totality of circumstances, White made plaintiffs feel threatened. He made clear to them they were a despised

race in his eyes, and FRC officials shrugged off his misconduct and racial hostility as though it were of no consequence. Plaintiffs each allege they were psychologically damaged by their experience and, especially in consideration of the coaching relationship, that is a reasonable response to White's abuse. Anyone with understanding of youth team sports can appreciate the extraordinary influence coaches exert over their players. Under *Monteiro*, plaintiffs' youth must be taken into account in considering a reasonable person's response to the abuse White wrought with his unchecked racial hostility.

### b. <u>Notice</u>

According to *Monteiro*, a district may have either actual or constructive notice of racial harassment. Actual notice may occur when a student or parent or other responsible person makes a complaint about racially demeaning incidents to the appropriate educational authorities." *Id*. at 1034.

> Monteiro alleged that her daughter and other African-American children experienced a pattern of racial abuse at McClintock High, and that students and parents complained about it to administrators at the school and the district. We conclude, therefore, that the complaint sufficiently alleges that the district had notice of discrimination.

*Monteiro*, 158 F.3d at 1034. Once on notice of the problem, a school district "has a legal duty to take reasonable steps to eliminate" a racially hostile environment. 59 Fed. Reg. 11450. "When a district is "deliberately indifferent" to its students' right to a learning environment free of racial hostility and discrimination, it is liable for damages under Title VI." *Monteiro*, 158 F.3d at 1034.

With respect to the "notice" element, plaintiffs allege that at least one of their coaches, Coach Small complained about White's mistreatment of the African-American student athletes to other coaches and to FRC administrators on several occasions such that FRC had actual notice of White's misconduct. In addition, White's misconduct was witnessed by other coaches who were in position to do something, including then head coach Mooshagian, who admitted in a communication to Small that White "had a problem with blacks."

### c. <u>Inadequate Response</u>

"Once on notice of the problem, a school district "has a legal duty to take reasonable steps to

'eliminate' a racially hostile environment." *Monteiro*, 158 F.3d at 1034. When a district is "deliberately indifferent" to its students' right to a learning environment free of racial hostility and discrimination, it may be held liable for damages under Title VI. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (citing *City of Canton,* 489 U.S. at 388-92). Under this standard, the district is liable for its failure to act if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that "it can be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

With respect to the element of "inadequate response," plaintiffs allege that, despite being on both actual and constructive notice of a racially hostile environment on their football team, FRC officials took no steps to remedy it. To the contrary, head coach Mooshagian and coach Johnson demonstrated their support of White in his intimidation, ridicule and discriminatory treatment of the African-American players by acknowledging his racism, laughing about it and even engaging in similar conduct themselves. White was never chastised or disciplined, and the conduct was permitted to continue. Accordingly, the complaint sufficiently alleges that the district had notice of discrimination. It goes without saying that such radical conduct directed to only one set of students exposes black students to a "risk of discrimination" that is so substantial and obvious that a failure to act can only be the result of deliberate indifference.

### C.    Trueblood and Johnson's Liability Under § 1981 and the Equal Protection Clause

Defendants Trueblood and Johnson may be held individually liable under § 1981 and the Equal Protection Clause for their roles in condoning and contributing to a hostile educational environment of which they had notice and permitted to continue unchecked and unremedied. As White's supervisors with authority to take disciplinary action and insure an educational environment free of racial harassment, these individuals may be held liable under § 1981 and the equal protection clause for their role in the hostile educational environment.

### E.    White's Liability Under § 1981 and the Equal Protection Clause

Finally, major wrongdoer Coach White may be held individually liable under § 1981 and the Equal Protection Clause for his direct role in creating a hostile educational environment for

plaintiffs.

**V.**      **CONCLUSION**

For reasons stated, defendants' Motion to Dismiss should be denied in its entirety. Alternatively, should the Court find any portion of the First Amended Complaint to be lacking, plaintiffs ask that they be given leave to amend. Upon granting a motion to dismiss for failure to state a claim, the court has discretion to allow leave to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a). "Absent prejudice, or a strong showing of any [other relevant] factor[], there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003).


Respectfully submitted,


Dated:  This 6th Day of July 2011.


/s/ Diane K. Vaillancourt
TERRI KEYSER-COOPER
DIANE K. VAILLANCOURT
*Attorneys for Plaintiffs Boyd, Hancock,*
*and Page*

# CERTIFICATE OF SERVICE

I, Diane K. Vaillancourt, declare as follows:

     I am over the age of 18 years and not a party to this action. My business address is 849 Almar Avenue, Suite C403, Santa Cruz, CA 95060.

     On this date, I served a copy of the following documents on the parties in this action as follows:

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

[ ]    BY UNITED STATES MAIL.  By placing a true copy of the above-referenced document(s) in the United States Mail in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ]    BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission from facsimile number (831) 458-3440 to the interested parties in this action at the facsimile number(s) shown below.

[ ]    BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[ X ]    BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure: Jennifer Lynn Hippo    jennifer@jsl-law.com, melissa@jsl-law.com, susan@jsl-law.com

     Alesa Schachter
     Jennifer L. Hippo
     JOHNSON, SCHACTER & LEWIS
     2180 Harvard Street, Suite 560
     Sacramento, CA 95815
     Tele: (916) 921-5800
     Fax:  (916) 921-0247

     I declare under penalty of perjury that the foregoing is true and correct.

     DATED:     <u>July 6, 2011</u>.          /s/ Diane K. Vaillancourt
                                       DIANE K. VAILLANCOURT